# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY, | Ct. No. 20-00104 |
| Plaintiff, | Before: Hon. M. Miller Baker, Judge |
| v. | |
| UNITED STATES, | **NON-CONFIDENTIAL VERSION** |
| Defendant, | |
| and | Business Proprietary Information has been redacted from pages 4, 6, 8, 10, 13, 14, and 16 |
| CATFISH FARMERS OF AMERICA, ET AL., | |
| Defendant-Intervenor. | |

## <u>PLAINTIFF NTSF'S REPLY TO DEFENDANT'S AND DEFENDANT-INTERVENORS' RESPONSES TO NTSF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Jonathan M. Freed
Robert G. Gosselink
Kenneth N. Hammer
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel to Plaintiff *NTSF Seafoods Joint Stock Company*

Dated: May 26, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................ii

GLOSSARY OF CASE SPECIFIC ACRONYMS....................................iv

I.   INTRODUCTION ...................................................................... 1

II.  ARGUMENT................................................................................ 2

   A.  COMMERCE'S USE OF PARTIAL ADVERSE FACTS
      AVAILABLE WAS UNLAWFUL BECAUSE COMMERCE NEVER
      REQUESTED FARMING FACTORS OF PRODUCTION FROM
      NTSF'S AFFILIATE ........................................................ 2

   B.  COMMERCE'S APPLICATION OF PARTIAL ADVERSE FACTS
      AVAILABLE DID NOT FILL THE PERCEIVED GAP IN THE
      RECORD AND WAS NOT SUPPORTED BY SUBSTANTIAL
      EVIDENCE ..................................................................... 5

   C.  THE AFA SELECTED FOR FISH FEED AND FINGERLINGS
      WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.......... 10

   D.  COMMERCE ABUSED ITS DISCRETION IN REJECTING
      NTSF'S MINISTERIAL ERROR ALLEGATION........................... 15

III.  CONCLUSION............................................................................... 29

i

# TABLE OF AUTHORITIES

## Cases

Changzhou Trina Solar Energy Co., Ltd. v. United States, 43 CIT __, 352 F.Supp.3d 1316.................................................................................. 10

Jinko Solar Co., Ltd v. United States, 961 F. 3d 1177 (Fed. Cir. 2020) ............................................................................................................... 12

Qingdao Taifa Group Co., Ltd. v. United States, 33 CIT 1090, 637 F. Supp. 2d 1231, (2009).............................................................................. 22

Shakeproof Assembly Components v. United States, 268 F.3d 1376 (Fed. Cir. 2011)........................................................................................... 23

Stanley Works (Langfang) Fastening Systems Co., Ltd. v. United States, 37 CIT 1369, 964 F. Supp. 2d 1311 (2013) ............................ 24–25

United States Steel Corp. v. United States, 42 CIT __, 348 F. Supp. 3d 1248 (2018) .................................................................................................. 26

## Statutes

19 U.S.C. § 1677e ............................................................................... 10, 12

## Regulations

19 C.F.R. § 351.309(c)(2) ......................................................................... 15

## Administrative Determinations

Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018, 85 Fed. Reg. 23756 (Apr. 29, 2020) and accompanying Issues and Decision Memorandum (Apr. 20, 2020) ................................................................................................ 1–2

Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018, 84 Fed. Reg. 56420 (Oct. 22, 2019) .......................................................... 15–16, 21

## GLOSSARY OF CASE-SPECIFIC ACRONYMS

| | |
|---|---|
| **NTSF** | NTSF Seafoods Joint Stock Company |
| **CFA** | Catfish Farmers of America, et al. |
| **FOP** | Factor of Production |
| **MUC** | Merchandise Under Consideration |
| **CONNUM** | Control Number |

**NON-CONFIDENTIAL VERSION**

## I.   INTRODUCTION

Plaintiff, NTSF Seafoods Joint Stock Company ("NTSF"), hereby replies to Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record, March 31, 2021  and to Response of Defendant-Intervenor Catfish Farmers of America, et al. ("CFA"), April 13, 2021. See Def.'s Resp. Consol. Pls.' Rule 56.2 Mots. J. Agency R. (Confidential Version), ECF No. 49, Mar. 31, 2021 ("Def.'s Resp. Br."), Resp. Br. Catfish Farmers of America and Individual U.S. Catfish Processors (Public Version), ECF No. 52, Apr. 13, 2021 ("CFA Resp. Br.").

This action is an appeal from the U.S. Commerce Department's final results of the fifteenth administrative review of the antidumping duty ("AD") order placed on certain frozen fish fillets from Vietnam in Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018, 85 Fed. Reg. 23756 (Apr. 29, 2020), P.R. 521, APPX1002–APPX1003 ("Final Results"), and the accompanying Issues and Decision Memorandum for the Final Results of

NON-CONFIDENTIAL VERSION

the Fifteenth Antidumping Duty Administrative Review; 2017–2018,

(Apr. 20, 2020), P.R. 509, APPX1005–APPX1039.

## II.   ARGUMENT

### A. COMMERCE'S USE OF PARTIAL ADVERSE FACTS AVAILABLE WAS UNLAWFUL BECAUSE COMMERCE NEVER REQUESTED FARMING FACTORS OF PRODUCTION FROM NTSF'S AFFILIATE

As NTSF argued in its moving brief, Commerce did not request that NTSF report farming factor of production ("FOP") data or usage data separately at each facility where FOPs are consumed in the production of upstream inputs (i.e., whole fish) later used to produce subject merchandise (i.e., frozen fish fillets).  Rather, Commerce required that NTSF report FOP usage and output at each facility at which it produces subject merchandise (i.e., frozen fish fillets).  See Mem. Supp. Mot. J. Upon Agency R. Pl. NTSF (Confidential Version) 20, ECF No. 40, Nov. 6, 2020 ("NTSF Br."), citing Initial AD Questionnaire at D-2, APPX1120.  The responses by Defendant and the CFA to this threshold contention fail to identify where Commerce specifically requested that the farming FOPs for an affiliated company, NTSF Vinh Long, should be provided.

2

For example, Defendant explained that the initial Section D Questionnaire required all respondents to "report factors information for all models or product types in the U.S. market sales listing submitted by you (or the exporter) in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States. <u>See</u> Def.'s Resp. Br. 55, <u>citing</u> NTSF Section D Questionnaire Response at D-2 (Dec. 18, 2018) (P.R. 172), APPX6908. The reported amounts should reflect the FOPs used to produce one unit of the merchandise under consideration ("MUC"). But this reference does not establish that Commerce requested the farming FOPs from NTSF's affiliate considering that Commerce further requested that, if the respondent produces merchandise under consideration (i.e., frozen fish fillets) at more than one facility, respondents should report FOP usage at each facility at which it produces such MUC. <u>See</u> NTSF Br. 20, <u>citing</u> Initial AD Questionnaire at D-2, APPX1120. As NTSF explained in its moving brief, all of NTSF's MUC is produced at NTSF's factory facility, NTSF Vinh Long does not have any factory or facility to produce MUC, and the MUC sold

by NTSF Vinh Long exclusively to [                    ] was toll-processed by NTSF on behalf of NTSF Vinh Long. Id. at 11.

In addition, the Defendant notes that NTSF was an "experienced respondent" that "was aware of Commerce's need" for the affiliate's farming FOPs. Def.'s Resp. Br. 57. And, CFA contends that NTSF "indicated that its reporting included all FOPs for NTSF and NTSF Vinh Long." CFA's Resp. Br. 10. However, that NTSF was arguably an experienced respondent that intended to report the farming FOPs of NTSF Vinh Long does not establish that Commerce ever requested that NTSF Vinh Long provide its farming FOPs.

Furthermore, NTSF explained that NTSF Vinh Long's farming FOPs related to only [      ] of all production in the FOP database and that Commerce had no basis to conclude that the NTSF Vinh Long farming FOPs were necessary considering their limited relevance. See NTSF Br. 21–22, citing NTSF's Verification Exhibit Resubmission," ("NTSF Verification Exs.") at Ex. 7A, APPX99034, APPX99036. Neither Commerce nor CFA explained how such an insignificant portion of the FOPs was necessary, but instead argue that Commerce defines what is necessary. Def.'s Resp. Br. 57; CFA Resp. Br. 12. The circular

reasoning of defining what is necessary as whatever Commerce determines is "necessary" leaves Commerce's decision resting on a logical fallacy.

The insignificance of the NTSF Vinh Long farming FOP's to the entire FOP database not only undermines Commerce's threshold determination to apply partial AFA, but it also reveals that Commerce's application of partial AFA did not fill the gap that Commerce verified to be missing, as discussed in more detail below.

## B. COMMERCE'S APPLICATION OF PARTIAL ADVERSE FACTS AVAILABLE DID NOT FILL THE PERCEIVED GAP IN THE RECORD AND WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

As NTSF argued in its moving brief, the gap in the record, if any, was the consumption of material, labor, and energy at the NTSF Vinh Long farm and those FOPs relate only to the goods toll processed by NTSF on behalf of NTSF Vinh Long. Furthermore, the record clearly showed the link between the fish harvested from NTSF Vinh Long farm and the specific finished goods toll produced for NTSF Vinh Long. See NTSF Br. 28, citing NTSF Verification Rep. at Attach., APPX102468–APPX102469, NTSF Verification Exs. at Ex. 7A, APPX98135–APPX98143, Ex. 13, APPX100136–APPX100158; see also NTSF Br.,

Attachment 1.  While the NTSF Vinh Long farmed fish potentially related to [    ] percent of production of one control number ("CONNUM")[1] sold to the United States, Commerce did not limit its application of AFA to fill this discrete gap.  Rather, Commerce applied AFA to all six CONNUMs in the FOP database despite verified, record evidence that the potential gap in the record related to only one CONNUM.

In this case, Commerce applied AFA to [     ] percent of all NTSF production and all CONNUMs.  See 15th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results Analysis Memorandum for NTSF Seafoods Joint Stock Company, (Apr. 23, 2020), C.R. 525, at 2, APPX102796 ("NTSF Final Analysis Memo").  While the NTSF Vinh Long farms accounted for [    ] percent of the fish harvested at both the NTSF farms and the NTSF Vinh Long farms, all but a miniscule portion of harvested fish from NTSF Vinh Long went to the toll production of non-subject

---

[1] The control number is assigned to the products in the U.S. sales database and the goods produced and reported in the FOP database so that Commerce can compare the U.S. selling prices to the FOPs of materially identical products.  See e.g., Def.'s Resp. Br. 6.

6

merchandise and merchandise for products for which the CONNUM did
not overlap with the CONNUMs for the goods sold to the United States.
With the exception of [      ] percent of the production quantity of
CONNUM [                              ], all of the farming FOPs for the
remaining five CONNUMs were derived from and based entirely on
farming FOPs from NTSF itself, which were verified in their entirety.
By applying AFA to [      ] percent of the farming factors reported by
NTSF, Commerce simply ignored those verified FOPs.  Thus, this
application was not gap-filling.  Rather, Commerce discarded verified
FOP usage information from the NTSF farm and replaced them with
AFA.  The gap to be filled, if any, was only [      ] percent of the
production quantity of CONNUM [                         ].  To the extent
that AFA was warranted at all, it should only have applied to this
verified production quantity.

Defendant explains that its decision to apply partial AFA to
[      ] percent of NTSF's production is supported by Commerce's
finding that NTSF Vinh Long's farming FOPs were not CONNUM-
specific.  Def.'s Resp. Br. 59.  Defendant's argument regarding
CONNUM specificity is misplaced.  Defendant explained that

7

"{r}espondents for Vietnam catfish have long been on notice that they must report FOPs on a CONNUM-specific basis" and that "NTSF was required to report its FOPs on a CONNUM-specific basis". Id. at 59–60. Defendant also explained that "Commerce properly concluded that NTSF's farming FOPs for whole fish are not CONNUM-specific." Id. at 60. Defendant's discussion on this point vaguely implies but never asserts that NTSF's method of reporting the farming FOPs was deficient in any way and led to Commerce's conclusion that it needed to apply partial AFA to [      ] percent of NTSF's production. But this implication, whether intended or not by Defendant, is false. Commerce found that NTSF provided FOPs on a CONNUM-specific basis.[2] In any event, the discussion regarding the CONNUM-specificity of farming FOPs obscures the relevant fact that the record clearly shows and Commerce verified the specific frozen finished goods to which the NTSF

---

[2] NTSF notes that in Defendant's response to CFA's argument that NTSF's FOPs where not reported on a CONNUM-specific basis, Defendant inserted the parenthetical "(except those pertaining to NTSF Vinh Long)" when explaining that NTSF provided FOPs on a CONNUM-specific basis. Def.'s Resp. Br. 48. The inserted parenthetical appears to have been provided in order to maintain a logical consistency between the response to the CFA's CONNUM-specificity argument and NTSF challenge regarding the application of partial AFA. But the assertion that the FOPs for NTSF Vinh Long are not CONNUM-specific lacks explanation or support in the record.

Vinh Long harvested fish were consumed. See NTSF Verification Rep. at Attach., APPX102468–APPX102469, NTSF Verification Exs. at Ex. 7A, APPX98135–APPX98143, Ex. 13, APPX100136–APPX100158; see also NTSF Br., Attachment 1. The NTSF Vinh Long farmed fish are only relevant to the FOP database reported by NTSF to the extent that those fish were used to produce CONNUMs that overlap with the CONNUMs in the U.S. sales database, i.e., NTSF was instructed to "report factors information for all models or product types in the U.S. market sales listing." See Def.'s Resp. Br. 55 (citing NTSF Section D Questionnaire Response at D-2, P.R. 172 (Dec. 18, 2018)). Attachment 1 to NTSF's moving brief included the "US/Non-US" column to identify CONNUMs that were sold in the United States as verified from Verification Exhibit 7A at page 9 (APPX99036), which identified six unique CONNUMs in the U.S. sales database. NTSF Br. 25. Had the NTSF Vinh Long farmed fish only related to CONNUMs that were not sold to the United States or had they only been used to produce non-fillet products (i.e., non-subject merchandise), then Commerce would have no reason to ever consider the NTSF Vinh Long farming FOPs. The only reason the NTSF Vinh Long farming FOPs are potentially

9

relevant is that [      ] kilograms of fish harvested from NTSF Vinh Long were used to produce a fillet product with CONNUM [

].  Id. at Attachment 1, pages 10–11 of 16.

Under 19 U.S.C. § 1677e(b) Commerce may use AFA to choose among facts of record, but the choice must fill in the information that is actually missing.  See Changzhou Trina Solar Energy Co., Ltd. v. United States, 43 CIT __, __, 352 F.Supp.3d 1316, 1327.  Accordingly, even if partial AFA applies here, the Court should remand with instruction that Commerce apply the partial AFA to only the [      ] percent of the production quantity of CONNUM [                    ].

## C. THE AFA SELECTED FOR FISH FEED AND FINGERLINGS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

In addition to applying AFA to NTSF's FOPs for which there could be a limited gap to be filled, Commerce also selected AFA amounts for fish feed of [      ] kilogram of feed per kilogram of frozen fish fillet and [      ] pieces of fingerling per kilogram of frozen fish fillet.  See NTSF Br. 30–31 (citing NTSF Final Analysis Memo, at 2, APPX102796).  NTSF also explained that it consumed and reported sixteen different sizes of fingerling ranging from 17 pieces per kilogram

to 35 pieces per kilogram. Id. Thus, NTSF reported 16 different FOPs for fingerling that were specific to the size of the fingerling when it was put into the farm pond. Similarly, NTSF consumed and reported three different types of feed based on the protein content of the feed, which were 26 percent protein, 28 percent protein, and 35 percent protein. Id. However, Commerce did not select the highest consumption rate for each fingerling size FOP and apply that as AFA to each fingerling size band. Rather, Commerce simply chose the highest consumption rate among all fingerling size-specific FOPs and assigned that consumption rate to each of the 16 fingerling FOPs. Id. Similarly, Commerce selected the highest consumption rate among FEED_26, FEED_28, and FEED_35 and assigned that as AFA to each of the three different feed FOPs.

NTSF explained in detail and in reference to specific record evidence why Commerce's approach for selecting AFA for fingerling and feed bears no rational relationship to how NTSF reported its FOPs and is contradicted by the record. Id. at 31–33. Neither Defendant nor CFA respond directly to NTSF's demonstration of the flaw in Commerce's application of partial AFA. Rather, Defendant argues that

11

Commerce does not need to consider the commercial reality of NTSF's operations in order to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. Def.'s Resp. Br. 62–63. But Commerce is guided not only by creating a proper deterrent to non-cooperation, but "also by the corroboration requirement in 19 U.S.C. § 1677e(c), which requires that the AFA rate be reasonably accurate. See Jinko Solar Co., Ltd v. United States, 961 F. 3d 1177, 1182 (Fed. Cir. 2020). When administering 19 U.S.C. § 1677e, Commerce must balance the need for accuracy and the need to deter non-cooperation. Id. In this instance, Commerce's application of AFA to NTSF's fingerling and feed consumption is arbitrary and demonstrably incorrect.

As explained previously, NTSF reported sixteen different sizes of fingerlings and expressed their consumption for each size. The consumption of fingerling within each of those fingerling sizes was valued using a size specific surrogate value. But, only five unique size-specific surrogate values were applied to NTSF's sixteen different fingerling FOPs. See NTSF Final Analysis Memo, at Attachment 1, APPX102794–APPX102999. For example, consumption of fingerling in

12

FOP sizes 23, 24, 25, 26, and 29 were all assigned the surrogate value of 6.000 rupees per piece. Id. The large size fingerlings (i.e., fingerlings of 17 pieces per kilogram), were assigned the surrogate value of 6.830 rupees per piece. Id. So, NTSF's consumption of fingerlings could have just as easily been grouped into five rather than sixteen different size groupings. Conversely, if the specificity of the surrogate values so required, NTSF might have reported thirty or forty different sizes of fingerlings even though the actual quantity of fingerlings consumed is unchanged regardless of whether they are recorded in five, sixteen, or forty different groups.

As explained in NTSF's moving brief, Commerce selected as AFA the highest rate of **[        ]** pieces of fingerling per kilogram ("kg") of frozen fish fillet and applied that amount to each fingerling size. See NTSF Final Analysis Memo, at 2, APPX102796. Thus, as applied, Commerce's AFA results in a total consumption rate of **[      ]** fingerling pieces per kilogram of frozen fillet (i.e., 16 *** [      ]**). Id. Had NTSF reported five fingerling sizes to correspond exactly with the size groupings of the available surrogate values, Commerce's AFA would assume a total consumption rate of **[      ]** fingerling pieces per kilogram

of frozen fillet (i.e., 5 *[      ]). Id. And, if NTSF has reported forty

groupings by size, Commerce's AFA would assume a total consumption

rate of [      ] fingerling pieces per kilogram of frozen fillet (i.e., 40

*[      ]). Id. All of these scenarios are flawed, but they demonstrate

that Commerce's method of applying AFA is completely arbitrary.

The same flaw exists for Commerce's AFA applied to the feed

consumption that was segregated by the protein content of the feed.

See NTSF Br. 31–33. Commerce could have summed the consumption

rates of the three categories of feed and selected the highest total feed

consumption among the six CONNUMs and then assigned the

surrogate value of 33.71 rupees/kg (i.e., the Feed35SV). See NTSF

Final Analysis Memo, at Attachment 1, APPX102800–APPX102801.

Similarly, Commerce could have summed the consumption of each of

the sixteen sizes of fingerling consumption and selected the highest

total fingerling consumption among the six CONNUMs and then

assigned the surrogate value of 6.83 rupees/piece (i.e., the Finger17SV).

Id. NTSF recognizes that it is not the Court's place to decide for

Commerce which facts available to choose and how to apply them, but

the Court also cannot sustain these arbitrarily applied AFA that bear

14

no rational relationship to how the FOPs are reported, or the reality of how the fish are cultured. Commerce's position is contradicted by the record and thus lacks any basis in substantial evidence.

## D. COMMERCE ABUSED ITS DISCRETION IN REJECTING NTSF'S MINISTERIAL ERROR ALLEGATION

As NTSF argued in its moving brief, Commerce lacked the authority to reject NTSF's ministerial error allegation because NTSF identified the error (i.e., deducting per-unit U.S. transportation expenses allocated on an invoice-specific basis) within the five-day time period provided in the Department's regulation. See NTSF Br. 45–52. Because Commerce committed a different arithmetic error in the Final Results (i.e., inadvertently deducting the expenses reported in the USOTHTRU field) than it committed in the Preliminary Results (i.e., inadvertently deducting the expenses reported in the USOTHTR2U field), neither 19 C.F.R. § 351.309(c)(2) nor the case law cited in Commerce's ministerial error rejection permits Commerce to reject a timely filed ministerial error request. Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary

15

Determination of No Shipments; 2017–2018, 84 Fed. Reg. 56420 (Oct.

22, 2019), P.R. 467, APPX16592–APPX16595 ("Preliminary Results").

The fact that Commerce's arithmetic error resulted in double-

counting the same expenses reported on different bases does not change

the reality that Commerce erroneously deducted U.S. movement

expenses reported on an invoice-specific basis, as reported in the

USOTHTR2U field, in the Final Results whereas Commerce

erroneously deducted the same U.S. movement expenses reported on a

[          ] basis, as reported in the USOTHTRU field, in the

Preliminary Results.  In other words, Defendant's argument that

Commerce declined to correct what it acknowledges is a calculation

error because it was untimely is without merit.

First, Defendant and CFA argue that Commerce's regulations

permit Commerce to reject the calculation error identified by NTSF

because NTSF did not raise the issue in its case brief.  See Def.'s Resp.

Br. 68–70; CFA Resp. Br. 18.  However, the untimeliness argument is

premised on the notion that the identical error was present in the

Preliminary Results.  See Def.'s Resp. Br. 69–70; CFA Resp. Br. 18.

Both Defendant and CFA identify the calculation error broadly as

"double-counting" in Commerce's calculation of NTSF's international movement expenses.  <u>See</u> Def.'s Resp. Br. 68; CFA Resp Br. 18. However, this characterization ignores the broader context of the distinct arithmetic errors committed in the <u>Preliminary Results</u> and the <u>Final Results</u>.  While Commerce used the same precise calculation in both the <u>Preliminary Results</u> and the <u>Final Results</u> (i.e., GRSPRU − INTNFRU −USDUTYU − USOTHTRU − USOTHTR2U), Commerce erroneously deducted a different transportation expense reported on a distinct basis in the <u>Preliminary Results</u> (i.e., USOTHTRU, reported on a basis evenly allocated across all sales) versus in the <u>Final Results</u> (i.e., USOTHTR2U, reported on an invoice-specific basis).  Therefore, the mathematical error in the <u>Preliminary Results</u> is distinct from the arithmetic miscalculation in the <u>Final Results</u>.

For the reasons discussed in NTSF's moving brief, the case law cited by Defendant—and by Commerce in its rejection of NTSF's ministerial error comment—does not support the rejection of a timely filed ministerial error comment where, as here, the calculation error was not present in the <u>Preliminary Results</u>.  <u>See</u> NTSF Br. 45–52; <u>see also</u> Letter re: "Antidumping Duty Administrative Review of Certain

17

Frozen Fish Fillets from the Socialist Republic of Vietnam: Rejection of Untimely Ministerial Error Allegation," P.R. 519, APPX17341 (May 21, 2020) ("Rejection of NTSF Ministerial Error Allegation") (rejecting NTSF's ministerial error allegation as untimely because the error referenced was discoverable in the <u>Preliminary Results</u> and citing two cases addressing the application of the exhaustion doctrine where a party had not raised a calculation error that was present in the preliminary results in its case brief and a third sustaining Commerce's a ministerial error that was not based on a arithmetic error).  Because Commerce cited no other justifications for the rejection, Commerce abused its discretion in rejecting NTSF's timely filed ministerial error comment.  Therefore, on remand, the Court should direct Commerce to consider NTSF's ministerial error comment.

In the <u>Preliminary Results</u>, Commerce described its calculation of NTSF's CEP as deducting other movement expenses from NTSF's reported gross unit price.  15th Administrative Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results Analysis Memorandum for the NTSF Seafoods Joint Stock Company, (Oct. 15, 2019), at 6, APPX97357.  In order to do so, Commerce

18

specifically stated that it deducted movement expenses recorded in the USOTHTRU field from NTSF's reported GRSUPRU. Id. In the margin program for the Preliminary Results, Commerce included expenses reported in both the USOTHTRU and the USOTHTR2U fields in NTSF's international movement expenses to be deducted from its constructed export price ("CEP"). Id. at Attach. 1 at SAS Log, Line 1306, APPX97377 (calculating the INTLMOVEU deduction from CEP by adding both the amounts reported in the USOTHTRU and the USOTHTR2U variables to the per-unit brokerage and handling SV calculated in the BHSV variable).

In the Final Results, the record reflects that Commerce intended to calculate NTSF's CEP price by deducting only the U.S. other movement expenses reported on a per-transaction basis by NTSF (as reported in the USOTHTR2U field). This fact is apparent from the fact that Commerce only verified the accuracy of the expenses reported in the USOTHTR2U field, and not the USOTHTRU field, as discussed in further detail on pages 38 through 40 of NTSF's moving brief. In other words, in the Final Results Commerce erroneously deducted the expenses reported in the USOTHTRU field.

CFA cites the fact that Commerce included the same calculation

that included both movement expense fields—USOTHTRU and

USOTHTR2U—in both the SAS programming and the excerpt from the

SAS program in its Preliminary Analysis Memorandum as evidence

that Commerce intended to include both movement expense fields in its

CEP calculation in both the Preliminary Results and Final Results.

CFA Resp. Br. 18. CFA's claim that Commerce intended "to include

both movement fields . . . in its constructed export price calculation" is

unsupported by the reasoning in Commerce's rejection of NTSF's

ministerial error allegation. Commerce acknowledged that counting

both variables was an error, but rather concluded that NTSF's

ministerial error allegation was untimely because Commerce found the

error was discoverable immediately following the issuance of the

Preliminary Results. Rejection of NTSF Ministerial Error Allegation,

P.R. 519, APPX17343 (rejecting NTSF's ministerial error submission as

untimely). Defendant likewise acknowledges that Commerce did not

reject the ministerial error based on the notion that Commerce

committed no error, but rather on the basis that NTSF had not

identified the error in its case brief. Def.'s Resp. Br. 69 (stating that

"Commerce did *not* reject the ministerial error allegation based on the *content* of the filing, but rather, explained that the filing was untimely because NTSF *should have* raised its allegations in its administrative case brief."). Moreover, the fact that the same calculation was contained in both the Preliminary Results and the Final Results does not change the fact that Commerce erroneously deducted a different variable (i.e., expenses reported in the USOTHTR2U field) in the Preliminary Results from the variable erroneously deducted in the Final Results (i.e., expenses reported in the USOTHTRU field).

Second, Defendant and CFA both seize upon the fact that NTSF allegedly proposed an international movement expense calculation that included the international movement expenses reported in both the USOTHTRU and the USOTHTR2U fields in its case brief. See Def.'s Resp. Br., at 68; CFA Resp. Br., at 19. However, at the time NTSF filed its case brief, Commerce had assigned a weighted-average dumping margin of $0.00 per kg to NTSF. Preliminary Results, 84 Fed. Reg. at 56421, P.R. 467, APPX16593. Therefore, the erroneous deduction of movement expenses reported in the USOTHTR2U field in the Preliminary Results, had no effect upon NTSF's dumping margin. In

21

other words, NTSF had no reason to identify the calculation error in its case brief because it had no impact on NTSF's margin based on the calculation methodology applied in the Preliminary Results. As discussed in NTSF's moving brief, the Court has recognized that, where the preliminary results were favorable to a party, that party is not required to raise an issue in its case brief merely to preserve judicial review. Qingdao Taifa Group Co., Ltd. v. United States, 33 CIT 1090, 1093, 637 F. Supp. 2d 1231, 1237 (2009). Yet, the effect of barring NTSF from identifying the error in Commerce's calculation of its movement expenses because it had not raised the issue in its case brief would be to require NTSF to raise an argument where it had no reason to anticipate the calculation error could have impacted the zero margin calculated in the Preliminary Results. This creates no benefit in terms of administrative efficiency because Commerce has regulations in place to require the correction arithmetic errors after the Final Results anyway. The fact that NTSF inadvertently repeated Commerce's calculation error in its case brief does not change the fact that Commerce committed a distinct arithmetic error in the Final Results.

Defendant evades the consequence that Commerce's movement

expense calculation is not accurate and unsupported by substantial evidence, and instead argues that NTSF should be barred from challenging the propriety of that calculation because NTSF repeated the calculation in its case brief. Def.'s Resp. Br. 69. Defendant cites no authority for the notion that a party cannot correct a ministerial error first identified in Commerce's final results because it repeated the erroneous calculation in its case brief. Commerce must "determine antidumping margins 'as accurately as possible'" in order to ensure that a dumping margin is consistent with the overall purpose of the antidumping statute. See Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2011). The fact that NTSF inadvertently repeated an inaccurate calculation that had no bearing on Commerce's preliminary dumping margin does not excuse Commerce from its legal obligation to accurately calculate NTSF's dumping margins in the Final Results.[3] Defendant points to no authority that

---

[3] CFA mischaracterizes Commerce's error as originating in NTSF's responses because NTSF included both the USOTHTRU and USOTHTR2U expense fields in its proposed revision of Commerce's preliminary international movement expense calculation. CFA Resp. Br. 19. NTSF reported the movement expenses in the USOTHTRU field as an indirect, allocated expense, because NTSF maintained this allocation methodology was the most accurate allocation basis. See NTSF Br. 35–37. Moreover, NTSF explained to Commerce that it continued to report the same transportation

justifies rejection of a timely filed ministerial error relating to a
calculation error first made in the <u>Final Results</u> simply because a party
quoted the error in its case brief without identifying the error because
the error had no impact on Commerce's preliminary margin.

Next, Defendant argues that the Court's holding in <u>Stanley Works
(Langfang) Fastening Systems Co., Ltd. v. United States</u> precludes
NTSF from challenging the calculation error here because it failed to
identify the error in its case brief.  Def.'s Resp Br. 70 (<u>citing</u> <u>Stanley
Works (Langfang) Fastening Systems Co., Ltd. v. United States</u>, 37 CIT
1369, 1401, 964 F. Supp. 2d 1311, 1342 (2013)).  However, the Court
addressed the timeliness of an error raised only after the issuance of the
final results where the same error in both the preliminary results and
final results.  <u>Stanley Works</u>, 37 CIT at 1401, 964 F. Supp. 2d at 1342.

---

expenses allocated on an invoice-specific basis in the USOTHTR2U field in
case Commerce did not accept the allocation basis used to report these
expenses in the USOTHTRU field.  Letter from Trade Pacific, PLLC re:
"Frozen Fish Fillets from Vietnam –NTSF's Resp. Dep't's Supplemental
Section C. Questionnaire" at Supp C-17, C.R. 413–432, APPX92030 (Apr. 26,
2019) (clarifying that NTSF reported the same U.S. other transportation
expenses reported in the USOTHTRU field "on an invoice-specific basis" in
the USOTHTR2U field of its revised Section C database).

Thus, there is no error in NTSF's response, and NTSF made clear that
it was reporting these <u>same</u> expenses on alternative bases.  The erroneous
counting of the movement expense reported in the USOTHTRU field
originated in Commerce's calculations, not NTSF's submitted databases.

Because the errors committed here are distinct, the holding in <u>Stanley Works</u> is not binding, and should likewise not be persuasive.

Moreover, the policy rationale of administrative efficiency is simply not applicable where, as here, the error was distinct and had no impact on Commerce's preliminary results margin calculation. There is no efficiency gained by requiring NTSF to identify a calculation error in its case brief—rather than following the <u>Final Results</u>—where that error had no impact on NTSF's preliminary margin and the distinct error in the <u>Final Results</u> did impact its margin. Defendant and Commerce point to no impediment—or any additional administrative steps—that would be required to issue amended final results correcting the error following the issuance of the <u>Final Results</u> versus correcting the error in the <u>Final Results</u> themselves. Commerce routinely issues amended final results, and Commerce offers no explanation why correcting what it acknowledges is a mathematical error in this case is more burdensome than correcting any other mathematical error timely identified.

CFA argues that Commerce's rejection is consistent with its practice in the immediately preceding administrative review. CFA

Resp. Br. First and foremost, Commerce did not cite—or even acknowledge the existence of a prior practice—in rejecting and declining to consider NTSF's ministerial error comment. See Rejection of NTSF Ministerial Error Allegation, P.R. 519, APPX17343. Rather, Commerce rejected NTSF's ministerial error based on its regulations and "controlling judicial precent." Id.

Second, even as framed by CFA, there is no evidence that Commerce's rejection of NTSF's timely filed ministerial error is predicated on the application of its past practice in the preceding administrative review. It is well-settled that even two prior determinations in separate administrative proceedings—let alone a single determination—are not sufficient to constitute an agency practice. See, e.g., United States Steel Corp. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1248, 1254 (2018) (quoting Shandong Huarong Mach. Co. v. United States, 30 CIT 1269, 1293 n.23, 435 F. Supp. 2d 1261, 1282 n. 23 (2006)). Rather, agency action becomes an established practice "'when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to' the agency's past action." Id. (internal citations

omitted).

Third, as discussed elsewhere, the erroneous deduction of the transportation expenses reported in the USOTHTR2U field had no impact on Commerce's calculation of NTSF's dumping margin in the preliminary results. In contrast, the error identified by CFA that was rejected by Commerce in the immediately preceding review was present in the preliminary results and would have impacted the preliminary margin calculation. Therefore, CFA's claim that there is no relevant difference between the ministerial error rejection in the previous segment and the instant one is incorrect.

Lastly, Defendant argues that the Court should decline to consider NTSF's claim that Commerce acted contrary to law and abused its discretion in rejecting NTSF's ministerial error because NTSF did not seek to amend its complaint to include this issue as a separate count. Def.'s Resp. Br. 70–71. The premise of Defendant's argument is incorrect. On November 2, 2020, the Court granted NTSF's consent motion for leave to file an amended complaint and deemed that amended complaint filed. See Order, ECF No. 34, Nov. 2, 2020; Am. Compl. Deemed Filed, ECF No. 35, Nov. 2, 2020. In Court Four of

27

**NON-CONFIDENTIAL VERSION**

NTSF's amended complaint, NTSF alleged that:

> Commerce unlawfully dismissed and declined to correct a
> clear, and timely filed, ministerial error identified by NTSF.
> In so doing, Commerce failed to follow the statutory mandate
> and its own regulations requiring it to allow interested
> parties present views regarding ministerial errors, analyze
> ministerial errors comments, and correct any ministerial
> errors by amending the <u>Final Results</u>.  Therefore, the denial
> of the ministerial error was not in accordance with law.

Am. Compl. ¶ 30.  At the time NTSF filed its initial complaint,

Commerce had not yet reached a decision on NTSF's ministerial error

allegation.  As a result, after NTSF's claim became ripe, it amended its

complaint to allege this additional count.  Therefore, there is no basis to

decline to consider NTSF's claim.

**NON-CONFIDENTIAL VERSION**

## III.   CONCLUSION

For the reasons set forth above, the Final Results issued by Commerce in the administrative review involving <u>Certain Frozen Fish Fillets From the Socialist Republic of Vietnam</u> are not supported by substantial evidence or are contrary to law.  Commerce's rejection of NTSF's timely filed ministerial error allegation was likewise contrary to law, for the reasons discussed in further detail above. Therefore, Plaintiff respectfully requests that this Court reverse and remand to Commerce with instructions to recalculate the weighted-average AD rate assigned to NTSF in accordance with the Court's opinion in this action.

Respectfully submitted,

<u>/s/ Jonathan M. Freed</u>
Jonathan M. Freed
Robert G. Gosselink
Kenneth N. Hammer

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiff
*NTSF Seafoods Joint Stock Company*

Dated:  May 26, 2021

29

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NTSF SEAFOODS JOINT STOCK COMPANY, ) | Ct. No. 20-00104 |
| Plaintiff, ) | |
| v. ) | Before: M. Miller Baker, Judge |
| UNITED STATES, ) | |
| Defendant, ) | |
| and, ) | |
| CATFISH FARMERS OF AMERICA, ET AL., ) | |
| Defendant-Intervenor. ) | |

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that Plaintiff NTSF's Reply To Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record and To Response of Defendant-Intervenor Catfish Farmers of America, <u>et al.</u> complies with the scheduling order.  The memorandum of law contains 5,919 words according to the word-count function of the word-processing software used to prepare the memorandum.

**Court No. 20-00104**

Respectfully submitted,

/s/ Jonathan M. Freed
Jonathan M. Freed
**TRADE PACIFIC PLLC**

700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  May 26, 2021